## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LORRIANA DIX,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **LENAPE VALLEY FOUNDATION,** | : | |
| *Defendant* | : | **No. 20-6383** |
| | : | |

### MEMORANDUM

PRATTER, J.                                                            DECEMBER 21, 2021

Lorianna Dix contends that the Lenape Valley Foundation ("Lenape Valley") unlawfully terminated her employment based on her race. Lenape Valley filed a motion for summary judgment, claiming that Ms. Dix cannot establish a prima facie case of discrimination or retaliation, or demonstrate that its asserted reasons for terminating her employment were a pretext for discrimination. However, Ms. Dix has presented evidence to establish material factual disputes that turn on credibility determinations unsuited for summary judgment. Thus, summary judgment must be denied.

### BACKGROUND

Lorianna Dix, an African-American woman, was hired by Lenape Valley to manage a behavioral health facility called "Forsythia" on March 2, 2020. Due to the onset of the COVID-19 pandemic, the opening of Forsythia was delayed to July 16, 2020. In the interim, as part of her job, Ms. Dix hired four African-American women with whom she had worked previously—Jacque Hines, Tia Bland, Kiara Evans, and Tracy Poindijour. Lenape Valley also provided two Caucasian staff members to assist Ms. Dix in opening Forsythia—Madison Dokos and Carly Powell.

A cacophony of accusations ensued. Complaints made by Ms. Dix and Ms. Dokos against

each other were followed by additional employee complaints, an investigation, and the termination of Ms. Dix's employment.

## I.    Ms. Dokos's First Round of Complaints About Ms. Dix

Ms. Dix began working with Ms. Dokos on July 16, 2020.  Later that day, a former supervisor named Kelsey Tomlinson called Ms. Dix to inform her about concerns raised by Ms. Dokos.  Ms. Dokos had complained to Ms. Tomlinson that Ms. Dix and another employee were not wearing their masks at all times as required and that the facility was not ready for opening. The following day, Ms. Dix's current supervisor, Janet Thompson, forwarded Ms. Dix a list of complaints sent to her by Ms. Dokos.  The complaints included allegations that Ms. Dix created a hostile work environment.  Ms. Thompson met with Ms. Dix to discuss the allegations and Ms. Dix was given an opportunity to submit a statement, in which she denied each allegation.  Then, Ms. Dix, Ms. Dokos, Ms. Thompson, and the Director of Human Resources, Traci Gorman, met via Zoom to discuss the allegations further.

After this meeting, Ms. Dokos emailed Ms. Dix asking about a patient's missing Benadryl pills on August 1, 2020.  *Id.*  ¶ 60.  Ms. Dix confirmed that an employee named Mary Jones had given the patient Benadryl without a prescription, which was in violation of Lenape Valley policy. *Id.* ¶¶ 68–70.  Ms. Dokos then complained to Ms. Dix that other staff members were aware of her initial complaint about Ms. Dix and she suspected that Ms. Dix had told other staff members about the complaint.  *Id.*  ¶¶ 71–72.

## II.    Ms. Dokos's Second Round of Complaints About Ms. Dix

Ms. Dokos then made a second formal complaint against Ms. Dix on August 6, 2020, which Ms. Dix describes as "9 pages of accusations painting Mx. Dix as a stereotypical 'angry black woman' only after working with her for a maximum of 7 days for only a few hours each day."

Doc. No. 25 Resp. ¶ 74. In her second formal complaint against Ms. Dix, Ms. Dokos made an assortment of allegations, including that Ms. Dix repeatedly commented on Ms. Dokos's "olive skin," asked Ms. Dokos about her opinion on the Black Lives Matter movement, made comments in a retaliatory tone about the first complaint, and favored the four employees she hired from her previous employer. Ms. Dokos also alleged that two of the four hires by Ms. Dix (Ms. Bland and Ms. Poindijour) spent time at Forsythia before they had completed the hiring process, in violation of company policy.

Ms. Thompson forwarded the complaint to Ms. Gorman, and Ms. Dix was again given an opportunity to review the complaint and respond.

### III.    Ms. Dix's Complaint About Ms. Dokos

Ms. Dix testified that on August 11, 2020, she met with Ms. Thompson to go over Ms. Dokos's complaints and "began to express to her [Ms. Dix's] concerns that [she] was being racially profiled." Doc. No. 25-3, Pl.'s Ex. B, Dix Tr. at 116:22–23; Doc. No. 25 ¶ 58. Ms. Dix introduces an affidavit from Ms. Bland asserting that Ms. Dokos's complaints were "racially stereotypical and offensive in that that she falsely accused Ms. Dix (and us) of being angry or aggressive, much in line with the stereotype or perception that black women are angry." Pl.'s Ex. F ¶ 15.

### IV.    Ms. McGlinchey and Ms. Thompson's Complaints About Ms. Dix

On August 11, 2020, another employee (Jennifer McGlinchey) contacted Ms. Thompson about payroll inaccuracies related to time cards that Ms. Dix had altered. Ms. Roberts also raised a time card issue related to "COVID pay." Ms. Dix does not dispute that she altered time cards, but states that she did so only to correct days when employees did not "punch out" and that she inadvertently made a mistake entering the wrong minutes on one of Ms. McGlinchey's time cards. Ms. McGlinchey also submitted a written complaint in which she noted that the four women hired

3

by Ms. Dix from her previous employer appeared to be close friends of Ms. Dix based on their interactions on social media (including pictures from a Puerto Rico vacation); supported Ms. Dokos's allegations of retaliatory comments; and complained that Ms. Dix had begun to act negatively toward her as well.

Then, on August 12, Ms. Tomlinson (the former supervisor) wrote to Ms. Thompson (the current supervisor) expressing concern that one of the four African-American employees hired by Ms. Dix traveled from Florida without quarantining before starting at the facility and noting that Ms. Dix became rude after she and Ms. McGlinchey expressed these concerns to Ms. Dix.

## V.    Investigation and Termination of Ms. Dix's Employment

Ms. Thompson and Ms. Gorman met with Ms. Dix on August 12, 2020 to inform her that she was being suspended.  Ms. Dix admits that, during this meeting with Ms. Thompson and Ms. Gorman, she did not say anything about racial discrimination.  Ms. Thompson then sent Ms. Dix an email stating that she was being suspended pending an investigation of Ms. Dokos's complaints. Ms. Thompson conducted an investigation that did not include speaking with the four African-American employees that Ms. Dix hired.  Ms. Dix again provided a response denying the allegations and did not raise the issue of racial discrimination because "she was asked to respond to the accusations made" and "just sticking to facts."  Doc. No. 25 Resp. ¶¶ 105–06.

On August 19, 2020, Ms. Gorman and Ms. Thompson informed Ms. Dix that her employment was being terminated.  The next day, Lenape Valley also terminated the employment of the four African-American employees hired by Ms. Dix.

Ms. Dix brought race discrimination and retaliation claims against Lenape Valley based on Title VII, Section 1981, and the Pennsylvania Human Relations Act.[1]  Ms. Dix also alleges race

---

[1] Ms. Dix also asserted hostile work environment claims in her First Amended Complaint, but withdrew these claims by stipulation after the completion of discovery. *See* Doc. No. 21.

discrimination and/or retaliation for the termination of Ms. Hines, Ms. Bland, Ms. Evans, and Ms. Poindijour's employment.  Lenape Valley moved for summary judgment, arguing that Ms. Dix has not introduced any admissible evidence of race discrimination.

LEGAL STANDARDS

## I.    Summary Judgment

A court can grant a motion for summary judgment if the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*  "Under Rule 56, the Court must view the facts and all reasonable inferences in the light most favorable to the non-moving party." *Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 384 (E.D. Pa. 2013).  But "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).  "Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Power v. Lockheed Martin Corp.*, 419 F. Supp. 3d 878, 888–89 (E.D. Pa. 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## II.    Employment Discrimination

Under the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), courts analyze Title VII, Section 1981, and PHRA claims under the same three-step analysis. *See Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims

under the PHRA are interpreted coextensively with Title VII claims."); *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (same analysis for Section 1981 claims).   The plaintiff faces the initial burden to establish a prima facie case of discrimination.   Then, if a prima facie case is established, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802.  If such a reason is offered, the plaintiff must then prove by a preponderance of the evidence that the proffered reasons were "not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

"Summary judgment is to be used sparingly in employment discrimination cases." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008).  "[B]ecause intent is a substantive element of the cause of action—generally to be inferred from the facts and conduct of the parties— the principle is particularly apt that courts should not draw factual inferences in favor of the moving party and should not resolve any genuine issues of credibility." *Jalil v. Avdel Corp.*, 873 F.2d 701, 707 (3d Cir. 1989) (quoting *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981)).

## DISCUSSION

Lenape Valley moves for summary judgment on both Ms. Dix's discrimination and retaliation claims.

## I.   Discrimination

Lenape Valley argues that Ms. Dix has not introduced facts sufficient to establish a prima facie case of discrimination.  Lenape Valley also argues that, even if she established such a prima facie case, Lenape Valley had several non-discriminatory reasons for the termination decision. Ms. Dix counters that the proffered reasons are mere pretext and that she has raised genuine disputes of material fact that preclude summary judgment.  The Court will begin with the prima

facie case analysis and then consider whether Ms. Dix has sufficiently called Lenape Valley's asserted non-discriminatory reasons into question as mere pretext.

## A. Prima Facie Case

First, the plaintiff bears the burden of establishing a prima facie case of discrimination. However, this burden is "not onerous." *Texas Dep't of Cmty. Affs.*, 450 U.S. at 253. "[T]he elements of a prima facie case depend on the facts of the particular case." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999). "To establish a prima facie case of race discrimination, [a plaintiff] must show (1) [s]he is a member of a protected class, (2) [s]he is qualified for [her] position, (3) [s]he suffered an adverse employment action, and (4) the adverse employment action gave rise to an inference of unlawful discrimination." *Durst v. City of Philadelphia*, 798 F. App'x 710, 713 (3d Cir. 2020).

Lenape Valley challenges only the fourth factor of this analysis, arguing that Ms. Dix has not introduced evidence that gives rise to an inference of discriminatory circumstances. Doc. No. 23-1, at 6. Lenape Valley argues that Ms. Dix cannot establish a prima facie case of discrimination because Ms. Dokos was a subordinate of Ms. Dix; the grounds for Ms. Dix's termination were provided by multiple employees, not just Ms. Dokos; and that Ms. Dokos played no role in the termination decision. Specifically, Lenape Valley contends that "while Ms. Dokos's complaints may have formed the genesis of the investigation into Plaintiff's conduct, they were not the sole source of the facts upon which [Lenape Valley] based its termination decision." Doc. No. 23-1, at 8. Lenape Valley cites *Neidigh v. Select Specialty Hosp.-McKeesport*, 664 F. App'x 217, 222 (3d Cir. 2016), where the Court of Appeals noted that the "allegedly biased report did not serve as the sole source of facts concerning the incident" that led to the termination decision.

However, Ms. Dix is not required to show that the allegedly racially-motivated complaints by Ms. Dokos were the "sole source" of the termination decision. Proximate causation is required only in so-called "cat's paw" cases, where a plaintiff seeks to impute a non-supervisor's actions to the employer. *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330 (3d Cir. 2015). This is because a non-supervisor's discriminatory bias matters for discriminatory termination purposes only if the employer actually adopts it. Here, Ms. Dix does not rely only on Ms. Dokos's actions; she challenges the way that Lenape Valley responded to Ms. Dokos's complaints in conducting its investigation and swiftly terminating her employment.

"To prevail at trial, the plaintiff must prove not that the illegitimate factor was the *sole* reason for the decision, but that the illegitimate factor was a *determinative* factor in the adverse employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Ms. Dix has introduced evidence that, when faced with complaints by Caucasian employees against an African-American employee, followed by a complaint of racial profiling by that African-American employee, Ms. Thompson summarily terminated the employment of all five African-American employees without interviewing four of them. And as discussed *infra*, determining whether the other asserted bases for Ms. Dix's termination (aside from Ms. Dokos's complaint) are credible or mere pretext is a fact issue for the jury.

Further, Ms. Dix contends that Lenape Valley failed to follow its progressive discipline policy, which requires counseling, followed by a first and second written reprimand, and then probation or suspension before termination. Lenape Valley initially emphasized that Ms. Dix's new-hire probationary period had been extended due to her lack of hours during the pandemic. *See* Doc. No. 23-1, at 1. However, Lenape Valley does not contend that this rendered the progressive discipline policy inapplicable. Instead, Lenape Valley argues that its written policy

8

expressly permits it to bypass progressive discipline in some cases. Specifically, the policy states that "[i]n cases involving serious misconduct, or when the Management Associate, in conjunction with the appropriate Executive Staff Member and the HR Director determines it is necessary, such as a major breach of policy or violation [of] law, the progressive procedures may be disregarded." Doc. No. 27 ¶ 77 (quoting Ex. GG). Lenape Valley contends that "[a]ltering time records and allowing unauthorized visitors in a work area are included in the non-exhaustive list of reasons for immediate termination." *Id.* Lenape Valley contrasts Ms. Dix's actions as a manager with examples that would merit progressive discipline such as attendance issues, uniform violations, or other minor offenses.

Lenape Valley also cites *Emmett v. Kwik Lok Corp.*, 528 F. App'x 257, 262 (3d Cir. 2013), in which the Third Circuit Court of Appeals found it significant that a plaintiff did not "produce[] evidence that this disciplinary policy was mandatory or rigorously followed, so little can be inferred from the company's decision not to adhere to the policy in this instance" for summary judgment purposes.

Here, however, the parties do not dispute whether the policy was typically followed, but rather, whether Ms. Dix's alleged conduct was sufficiently severe for an exception to apply. Ms. Dix disputes that she altered time cards inappropriately and argues that this was not a reason for termination listed in her termination form. Lenape Valley counters that the Executive Summary of the investigation submitted with the form includes the time card issue. Ms. Dix testified that she altered time cards only to correct "punch out" errors and that she made a mistake on only one of Ms. McGlinchey's time cards. The Court finds that this is a genuine factual dispute as to whether Ms. Dix's actions were a sufficiently "major breach of policy or violation [of] law" to merit her employer's decision to disregard the progressive discipline policy. Therefore, Ms. Dix

has introduced evidence to create a genuine dispute of fact as to whether there were discriminatory circumstances that could give rise to an inference of discrimination.

### B. Pretext

Lenape Valley also argues that it has established several legitimate, non-discriminatory bases for the termination and that Ms. Dix cannot make a showing of pretext because she did not make the racial discrimination allegation until the investigation of the second complaint. However, Ms. Dix argues that there are circumstances giving rise to an inference of pretext because Lenape Valley failed to follow its progressive discipline policy and has provided inconsistent reasons for her termination.

"To discredit the employer's proffered reason . . . the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d. Cir. 1994) (internal quotations omitted).

In addition to making an exception to its progressive discipline policy, Ms. Dix argues that Lenape Valley has provided shifting and inconsistent reasons for the termination decision. Ms. Dix points out that Ms. Gorman testified that she based the termination decision on Ms. Dix's alleged retaliatory behavior, the Benadryl medication issue, and the time card issue, whereas the termination form does not list the time card issue and Ms. Thompson raised the hostile work environment accusations as the basis for the termination. The Court also notes that Lenape Valley did not appear to raise the unauthorized visitor issue (regarding Ms. Bland and Ms. Poindijour's pre-hire visits) as a basis for the termination decision until this litigation, in their response to Ms.

Dix's Counterstatement of Facts. Neither the termination form nor the Executive Summary mention the unauthorized visitor issue.

Lenape Valley argues that the Executive Summary submitted with the termination form included the time card issue and that the Termination Notice broadly indicates that "Violation of Policy" was the general reason for termination. Doc. No. 27-1, at 10. Lenape Valley further argues that the variety of supported bases for Ms. Dix's termination are not evidence of any inconsistency. However, asserting a catch-all reason such as "Violation of Policy" as the basis for a termination decision does not shield an employer from a finding of pretext. In the context of the concurrent termination of five African-American women based on scattershot joint allegations from Caucasian co-workers, the variety of justifications proffered can, in fact, call into question whether the asserted reasons were the real basis for the termination decision. Where the employer has provided shifting reasons for a termination decision, the evidentiary weight behind each reason is a factual issue for a jury, not the Court on a summary judgment motion.

## II.    Retaliation

Ms. Dix also alleges that her termination was retaliation for protected activity under Title VII. Lenape Valley argues that she has not established a prima facie case of retaliation because it is undisputed that Ms. Gorman was never aware of any allegations of racial discrimination made by Ms. Dix and that the investigation maintained the status quo at the time of her allegations of racial discrimination because she was already under investigation.

"To advance a prima facie case of retaliation under Title VII . . . a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a

causal link exists between the employee's protected activity and the employer's adverse action."
*Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001).

Lenape Valley challenges the causal link by arguing that Ms. Gorman was never aware of Ms. Dix's claim of racial discrimination in order to retaliate against her on this basis. Yet Lenape Valley also asserts that "[t]he decision to terminate Plaintiff was made by Ms. Thompson and Ms. Gorman." Doc. No. 27-1, at 4–5. Ms. Dix argues that she has, in fact, introduced evidence that the termination decision maker was aware of her complaint of racial discrimination because she testified that she complained about racial discrimination to Ms. Thompson on August 11, 2020.[2] Because Ms. Thompson and Ms. Gorman were both decisionmakers by Lenape Valley's own admission, Lenape Valley's argument concerning Ms. Gorman's lack of awareness is unavailing.

Ms. Dix's employment was terminated on August 19, 2020, and she emphasizes that the temporal proximity between her August 11 complaint and August 19 termination support a causal link. The Court agrees. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) ("Our cases have established that temporal proximity between the protected activity and the termination is sufficient to establish a causal link."). Ms. Dix creates a genuine dispute of fact through her testimony that she complained about racial discrimination to Ms. Thompson eight days before her termination.

Lenape Valley also argues that the investigation maintained the status quo at the time Ms. Dix purported to raise a racial discrimination complaint with Ms. Thompson. Lenape Valley cites case law for the proposition that "[m]aintaining the status quo . . . cannot reasonably be inferred to be a retaliatory act." *Hernandez v. EHC Assocs., Inc.*, No. 17-cv-05263, 2018 WL 3032880, at *5 (E.D. Pa. June 19, 2018); *see also Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 425 (1st Cir.

---

[2] Ms. Dix argues that verbal complaints to management are protected activity. *See Sgro v. Bloomberg L.P.*, 331 F. App'x 932 (3d Cir. 2009).

1986) ("Title VII is neither a shield against this broad spectrum of employer actions nor a statutory guaranty of full employment . . . ."). Because Ms. Dix alleges that she only made the racial discrimination claim at a meeting with Ms. Thompson regarding Ms. Dokos's *second* complaint, Lenape Valley argues that the investigation (which had started before that time) maintained the status quo of investigating Ms. Dokos's allegations. Lenape Valley further contends that "baseless allegations of discrimination in the face of an investigation into legitimate claims of misconduct cannot serve as a de facto 'get out of jail free card' and insulate Plaintiff from discipline that she knew was coming." Doc. No. 27-1, at 7.

However, a reasonable jury could find that the timeline does not support this narrative. Ms. Dix made the racial profiling complaint on August 11, which was the day *before* the meeting where she was informed that she was being suspended pending further investigation. Ms. Dix also disputes that she "knew" she would be suspended and/or terminated. Her testimony thus calls into question whether the subsequent discipline simply maintained the status quo. Ms. Dix testified that, at the August 12 meeting with Ms. Gorman and Ms. Thompson, she did not understand why she was being suspended. Ms. Dix also provides plausible justifications for not raising the racial profiling allegation until the second complaint by Ms. Dokos. Her profiling allegation focuses on the second, 9-page complaint by Ms. Dokos in particular as the source of the "angry Black woman stereotype," and alleges that Ms. Thompson's investigation itself was discriminatory. A reasonable jury could find that Ms. Dix raised the racial profiling concerns as a rational response to the progression of an unfair investigation, rather than a "get out of jail free card" as portrayed by Lenape Valley.

That these co-workers did not warm to each other would be an under-statement. The root causes and the ramifications of the antipathy are important for resolving this case. At its core, this

dispute is one of credibility.  "Credibility determinations . . . are inappropriate to the legal conclusions necessary to a ruling on summary judgment." *Country Floors, Inc. v. P'ship Composed of Gepner & Ford*, 930 F.2d 1056, 1062 (3d Cir. 1991).  Because the Court determines that there are genuine disputes of material fact that turn on credibility determinations, the Court will deny summary judgment on the retaliation claim.

## CONCLUSION

For the foregoing reasons, the Court denies Lenape Valley Foundation's motion for summary judgment on Ms. Dix's claims.  An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE